ORKIN PEST CONTROL, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Alan K. Marsh, Appellee).

First District (Industrial Commission Division)   No. 1—88—3078WC

Opinion filed August 4, 1989.

August M. Mangoni, Ltd., of Chicago (August M. Mangoni and Louis G. Atsaves, of counsel), for appellant.

Hariette Lakernick, of Chicago, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Alan Marsh, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*) alleging that he had suffered a work-related injury on August 16, 1985. The arbitrator found that claimant was not temporarily and totally disabled (TTD) after October 27, 1986, and that he failed to show that rehabilitation or vocational training was appropriate or necessary.

The Industrial Commission (Commission) reversed the arbitrator's decision, finding that claimant was disabled from August 24, 1985, to July 21, 1986, and from October 28, 1986, to July 1, 1987, the date on which the arbitration hearing was held. Further, the Commission found that claimant was entitled to vocational rehabilitation. The circuit court of Cook County confirmed the Commission as to TTD benefits and remanded the case to the Commission with instructions to complete its vocational rehabilitation award. On remand, the Commission adopted the vocational rehabilitation award as fashioned by a rehabilitation specialist. The circuit court confirmed this decision, and this appeal followed.

On appeal, respondent raises four issues, namely: (1) the award of TTD benefits subsequent to October 27, 1986, was against the manifest weight of the evidence; (2) the record does not support an award of vocational rehabilitation; (3) the Commission considered evidence not contained in the record; and (4) the Commission's decision was not timely.

In addressing defendant's argument that the Commission's award of TTD benefits subsequent to October 27, 1986, was against the manifest weight of the evidence, the following facts are pertinent. Claimant testified to the following at the arbitration hearing. In August 1985, claimant was employed as a pest control technician by respondent, and he operated a commercial route which included servicing restaurants, factories, bakeries, hotels, landfills, and industrial sites. On August 16, 1985, he serviced three landfills, putting out ro-

dent bait on the premises. At one landfill, while putting out the bait, claimant stepped on some "green liquid" that was oozing out of the ground. Claimant was wearing boots at the time. He noticed that his feet were starting to burn. At the end of the workday, claimant reported the incident to his supervisor, Douglas Dee.

Over the weekend, claimant soaked his feet in Epsom salts and applied vaseline and hand cream to them. He noticed his feet were swelling and starting to turn purple. On August 24, 1985, after noticing the discoloration spreading up his legs, claimant sought medical attention at Humana Medfirst (Humana). On August 26, 1985, the discoloration had extended to his torso; claimant also experienced swelling in his joints. Humana referred him to Dr. J. Walthers, who prescribed medication and additional testing.

Dr. Walthers subsequently hospitalized claimant at South Suburban Hospital for five days, during which time numerous tests were performed. Dr. Walthers determined that claimant had hemmorrhagic dermatitis involving both lower extremities. Scattered eczematoid lesions were located over claimant's trunk. Dr. Walthers' diagnosis was toxic dermatitis, etiology unknown. Claimant's condition began to improve with a treatment regimen of ointments and medication.

Claimant was then referred to a dermatologist, Dr. Katherine Wier, who first saw him on January 10, 1986. Dr. Wier diagnosed claimant's condition as probable allergic contact dermatitis. In a letter dated April 22, 1986, written to respondent's insurer. Dr. Wier stated that there had been an excellent resolution of allergic contact dermatitis but that claimant was experiencing a flare-up of psoriasis which originated in the severe dermatitis. Allergy testing conducted by Dr. Wier, in or about March 1986, indicated that claimant was allergic to a number of chemicals, some of which were present in industrial chemicals. At this time, Dr. Wier noted considerable skin discoloration in places where the dermatitis and psoriasis had previously occurred.

In mid-April 1986, claimant began twice weekly ultraviolet treatments to achieve complete clearing of the skin. Dr. Wier opined that, due to his severe allergies to certain chemicals, claimant should not return to chemical work as on his previous job. Dr. Wier further stated that claimant should be rehabilitated into a job that does not involve said chemicals.

In a July 18, 1986, letter to respondent's insurer, Dr. Wier diagnosed claimant's condition as follows: (1) residual psoriasis in scattered small plaques, remaining as a Koebner reaction form; (2) severe contact dermatitis from chemicals at work; and (3)

hyperpigmentation of the skin on legs and arms. Dr. Wier stated that claimant was not to come in contact with pesticides.

In a March 23, 1987, letter to respondent's insurer, Dr. Wier wrote the following:

> "When last seen on March 20, 1987, [claimant] showed considerable improvement over his initial presentation. At present scattered plaques of psoriasis 2-3 cm. in diameter are present over his legs and arms. His elbows show hyperkeratosis. His legs show no edema, but macular hyperpigmented areas remain corresponding to previous areas of psoriasis. The feet show no edema, only a vidaceous color, as a residual from the dermatitis, also from sitting in dependent positions."

Dr. Wier stated that the therapy for claimant's psoriasis consisted of continued topical applications of medication and ultraviolet light treatments, which he received once a week.

Claimant reported at arbitration that his ankles, knees, elbows, and wrists hurt occasionally. The arbitrator observed that claimant's feet were purplish in color.

Regarding the second issue, namely, whether claimant was eligible for vocational services, claimant testified at arbitration that he returned to work for respondent on July 21, 1986, as a commercial account executive. Claimant received a week of training for this assignment, which primarily consisted of selling yearly pest control accounts to commercial businesses by telephone to different industries and offering free inspections or by door-to-door solicitation.

Claimant testified that he did very poorly in this position and was called in several times by his supervisor to discuss his failure to meet sales goals. On October 27, 1986, respondent terminated him from this position due to low sales of pest control contracts. Claimant stated that he had received no rehabilitation services.

Further, claimant testified that he had been in the pest control business for 20 years. He had worked for respondent since 1976 and received a number of employment-related certificates of merit from respondent. Claimant stated that he had been looking for work since his termination by respondent. He applied to a couple of food stores to be a night stocker or bagger but was not hired. Claimant sought work at an auto repair shop, which had enough help at the time. After attending a two-day sales seminar put on by a company which sold vacuum cleaners, claimant was "let go." He submitted an application to the State of Illinois Highway Division but was not contacted. Claimant applied for several delivery positions, but these positions were either filled by other applicants or required a class C

driver's license, which he did not have. He worked part time for a shipping company, which let him go after two days' work.

On January 30, 1987, claimant was seen at his own request by Steven Blumenthal, a rehabilitation supervisor for Ellis and Associates, Inc. Mr. Blumenthal reviewed claimant's medical records and work history and evaluated his skills and interests. Mr. Blumenthal concluded that claimant could complete a successful job placement program but would require the assistance of a job placement specialist, skilled in making contacts with employers. He noted that a sales position, such as that offered by respondent, was both outside claimant's vocational strengths and inappropriate, considering his physical appearance. Mr. Blumenthal reported that claimant's vocational prognosis was good, given his long and stable work history, his high school degree, and his strong motivation to work.

Mr. Blumenthal further stated:

"It is felt that, given medical clarification from Dr. Wier, Mr. Marsh, with the assistance of a Rehabilitation Job Placement Specialist, could *** identify employers who could provide route/delivery service work with products which would not be an irritant for him, and it is Mr. Marsh's wish that initial employment options such as the above be viewed as he prefers to work on an outside basis. However, Mr. Marsh is not in a position where he can go out by himself and explain to employers why he would not be able to work on Friday's currently [due to weekly ultraviolet treatments]. Also, he would have difficulty in convincing employers given his current physical appearance to hire him and very well might have difficulty in obtaining employment without the assistance of a Rehabilitation Placement Specialist to intervene on his behalf with employers."

Respondent presented no evidence to show that claimant did not need vocational rehabilitation services or the assistance of a job placement specialist.

We first address respondent's argument that the award of temporary total disability benefits subsequent to October 27, 1986, is not supported by evidence in the record. Respondent contends that Dr. Wier's reports subsequent to October 27, 1986, make no recommendation as to whether or not claimant should be off any work due to his condition of ill-being. Respondent contends that there is no indication in the record that claimant's inability to work around or be exposed to certain chemicals somehow severely restricts his choices of reasonably stable jobs.

In response, claimant contends that the medical evidence clearly establishes that the August 16, 1985, accident has caused an ongoing medical condition which prohibits him from returning to his former career and, further, requires medical clarifications as to any other type of employment he may pursue.

■■ ■ It is axiomatic that a reviewing court will not overturn the Commission's decision unless it is against the manifest weight of the evidence. (*Certi-Serve, Inc. v. Industrial Comm'n* (1984), 101 Ill. 2d 236.) Moreover, an employee is temporarily totally disabled for the purposes of the Act until he is restored or stabilized. (*Boker v. Industrial Comm'n* (1986), 141 Ill. App. 3d 51.) Here, the evidence supports the Commission's decision to award claimant TTD benefits from October 27, 1986, to July 1, 1987. The medical evidence, adduced primarily through Dr. Wier's letters and claimant's testimony, supports the Commission's finding. Dr. Wier's diagnosis as of March 23, 1987, consisted of three elements: (1) severe allergic contact dermatitis with allergies to a number of common industrial agents; (2) severe generalized psoriasis; and (3) a tremor of unknown origin.

Claimant testified to a number of ongoing symptoms which arose from his work-related accident: discoloration of skin, pain in joints, and psoriasis. Moreover, the Commission could reasonably infer that claimant's inability to find work following respondent's termination of him was due to his continuing condition of ill-being, as suggested by the rehabilitation specialist. From this evidence, the Commission could reasonably conclude that between October 27, 1986, and July 1, 1987, claimant's condition of ill-being had not yet stabilized nor was he restored to health, and therefore, he was eligible for TTD benefits during that period.

■ Next, respondent argues that vocational rehabilitation services are unnecessary. Respondent contends that claimant has already received vocational training in the form of the week-long program, which preceded his sales position with Orkin, and on-the-job training in said position. Respondent characterizes the Commission's award of rehabilitative services as forcing it a second time to help claimant make a new start in life. Further, respondent rhetorically asks how it is to rehabilitate the claimant, who, it asserts, clearly does not want to be helped. In contrast, claimant contends that there is ample evidence to support the award of vocational rehabilitation with TTD.

In *National Tea Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 424, our supreme court outlined the standards to be followed when considering the appropriateness of a vocational rehabilitation award.

"Generally, a claimant has been deemed entitled to rehabilitation where he sustained an injury which caused a reduction in earning power and there is evidence rehabilitation will increase his earning capacity. [Citation.] Related factors concern a claimant's potential loss of job security due to a compensable injury [citation], and the likelihood that he will be able to obtain employment upon completion of his training. [Citation.] In contrast, rehabilitation awards have been deemed inappropriate where the claimant unsuccessfully underwent similar treatment in the past [citation]; where he received training under a prior rehabilitation program which would enable him to resume employment [citation]; where he is not 'trainable' due to age, education, training and occupation [citation]; and where claimant has sufficient skills to obtain employment without further training or education [citation].

Other factors which we consider appropriate are 'the relative costs and benefits to be derived from the program, the employee's work-life expectancy, and his ability and motivation to undertake the program, [and] his prospects for recovering work capacity through medical rehabilitation or other means.' [Citation.] Whether a rehabilitation program should be designed to restore claimant to his pre-injury earning capacity depends upon the particular circumstances. However, as this court suggested in *Hunter*, such a standard should not be inflexibly applied." 97 Ill. 2d at 432-33.

The evidence indicates that claimant has sustained an injury which has substantially diminished his earning power. Mr. Blumenthal's report indicates that claimant, assisted by vocational rehabilitation services, could at least regain some of his lost earning capacity. His age (40 as of the arbitration hearing) and education pose no significant barriers to any vocational assistance he would receive. Moreover, it does not appear that claimant has sufficient skills to obtain employment without vocational assistance.

We find that the Commission's decision to award vocational rehabilitation services was not against the manifest weight of the evidence.

■■ Next, respondent argues that the Commission used information not contained in the record to determine whether claimant was entitled to additional TTD benefits and vocational rehabilitation. Specifically, it takes issue with the Commission's finding, in its first decision, that claimant's face and entire body were covered with a rash, the result of which was an appearance not conducive to being a

salesperson. Respondent asserts that a description of this finding by the Commission does not appear in the record.

In its judgment order, the court below stated the following: "[W]hen this Court questioned the counsel about the proceedings before the Commission [on] review, both counsel admitted they were present and both agreed that when Petitioner presented himself for examination by members of the Commission *** the Respondent made no objection. Objections not raised are waived[;] therefore, we find this issue has been waived."

We agree with the circuit court that respondent, having failed to object before the Commission, has waived this argument. *Mueller v. Soffer* (1987), 160 Ill. App. 3d 699.

■ Finally, respondent argues that the Commission's decision was not timely and was issued in violation of section 19(b—1) of the Act, which reads in pertinent part as follows:

"The Commission shall adopt rules, regulations and procedures whereby the final decision of the Commission is filed not later than 90 days from the date the petition for review is filed but in no event later than 180 days from the date the petition for an emergency hearing is filed with the Industrial Commission." Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b—1).

Section 7020.80(b)(4)(D) of the rules governing practice before the Industrial Commission reads in relevant part as follows:

"The Commission shall file its decision no more than 90 days after the filing of the Petition for Review, and not later than 180 days from the filing of the Petition under Section 19(b—1), whichever is sooner." 50 Ill. Adm. Code 7020.80(b)(4)(D) (1986).

According to the record, the petition for immediate hearing pursuant to section 19(b—1) was filed by claimant with the Commission on May 29, 1987.

The decision and opinion on review by the Commission was dated and entered December 24, 1987, or 209 days after the filing of the petition, more specifically, 29 days after the statutory deadline noted above.

Respondent argues that this is a blatant disregard of the commands of the statute and the commands of the Commission's own rule and, as such, serves as one of the reasons to vacate the Commission's decision.

Respondent ignores the fact that the original arbitrator who heard this case died suddenly, setting this case back at least a month, which accounts for the Commission's delay in filing this decision and

opinion on review. Under these unforeseen circumstances, the Commission understandably did not comply with the statutory guidelines and its own rules. Moreover, respondent has posited no evidence that it was injured in any way by the delay.

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

BARRY, P.J., and McNAMARA, McCULLOUGH, and LEWIS, JJ., concur.