2017 IL App (2d) 160351WC
No. 2-16-0351WC
Opinion filed September 19, 2017

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

Workers' Compensation Commission Division
_____

| | | |
|---|---|---|
| BARBARA J. DUKICH, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County, Illinois |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 15-MR-358 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION, *et al.* | ) | |
| | ) | Honorable |
| (Fenton Community High School District 100, | ) | Paul M. Fullerton, |
| Appellee). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices Hoffman, Hudson, Harris, and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The claimant, Barbara J. Dukich, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2012)), seeking benefits for injuries she allegedly sustained while working for respondent Fenton Community High School District 100.  The claimant sustained injuries to her face, right shoulder, and right hip when she fell on wet pavement at the employer's premises while walking to her car on her way to lunch. After conducting a hearing, an arbitrator found that the claimant had sustained accidental injuries arising out of and in the course of her employment with the employer and awarded the claimant

temporary total disability (TTD) benefits, permanent partial disability (PPD) benefits for 10 % loss of the person as a whole, and medical expenses.

¶ 2    The employer appealed the arbitrator's decision to the Illinois Workers' Compensation Commission (Commission), which reversed the arbitrator's decision.  The Commission found that the claimant's injury "did not result from an employment-related risk or from a neutral risk to which [the claimant] was at increased exposure as a result of her employment."  Accordingly, the Commission concluded that the claimant had failed to prove that her injuries arose out of her employment with the employer and denied benefits.

¶ 3    Commissioner DeVriendt dissented.  Commissioner DeVriendt concluded that the claimant was exposed to a greater risk than that faced by the general public at the time of her injury because her accident was the result of a hazardous condition (wet pavement due to rain) that the claimant regularly had to traverse in order to access her car, which was parked in a designated parking space in a lot controlled by her employer.

¶ 4    The claimant then sought judicial review of the Commission's decision in the circuit court of Cook County, which confirmed the Commission's ruling.

¶ 5    This appeal followed.

¶ 6                                    FACTS

¶ 7    The claimant worked for the employer as an attendance clerk.  She drove to work on a daily basis and usually drove home for lunch.  The employer provided the claimant a designated parking space (space No. 48) in the school parking lot, which was adjacent to the school.

¶ 8    At approximately 1 p.m. on February 23, 2012, the claimant exited the school building to go home for lunch.  Because it was raining hard at the time, the claimant was carrying an umbrella as well as her purse.  After exiting the building, the claimant began walking toward the parking lot where her car was parked.  As she walked down a handicap ramp between the

building's entrance and the street level, the claimant lost her footing on the wet ramp and fell face first onto the pavement of a crosswalk in an adjacent bus run, striking her head and nose. When asked during the arbitration hearing what caused her to fall, the claimant responded, "[t]he rain. The water." During cross-examination, the claimant acknowledged that, at the time of her fall, she was wearing open-back, clog-like shoes, which had no strap or support on the back of them.

¶ 9    The claimant's fall was recorded on the employer's security video, which was introduced into evidence. The video shows the claimant walking out of the school on the cement pavement between the school building and the parking lot. The claimant stumbles or slips and then struggles to regain her footing before she falls face first onto the pavement. The video depicts raining conditions and obviously wet pavement. The arbitrator viewed the video both during and after the arbitration hearing. The claimant identified herself as the person falling in the video.

¶ 10    Immediately after the incident, the claimant was taken to the school nurse's office in a wheelchair.[1] She was complaining of a headache, and the nurse noticed some bleeding in her mouth. When paramedics from the Bensenville fire department arrived on the scene, they found the claimant sitting in a chair in the school nurse's office complaining that her head hurt. The claimant stated that she was walking to her car when she slipped on wet pavement and hurt her head. A golf-ball-sized hematoma was noted on the claimant's forehead, and a one-inch laceration was noted on the bridge of her nose.

¶ 11    The claimant was taken by ambulance to the emergency room at Elmhurst Memorial Hospital. Dr. Jeffrey Bohmer, the examining physician, noted that the claimant had arrived via

---

[1] The school nurse's notes reflect that the claimant was "assisted in with [a] wheelchair and escorted to [the] health office" "due to rain/safety concerns."

ambulance after slipping on a wet surface. The claimant was diagnosed with a contusion/hematoma on her head and was referred for a computed tomography (CT) scan of her brain and facial bones. The brain CT scan was normal, but the maxillofacial CT scan revealed a nasal bone fracture. The claimant was taken off work and instructed to follow up with her primary care physician, Dr. Dorothy Prusek.

¶ 12    On February 27, 2012, the claimant treated with Dr. Prusek. The claimant told Dr. Prusek that she had suffered an injury when she was walking out of work and fell in the rain. She complained of severe headaches and cervical spasms with episodic vertigo. Dr. Prusek diagnosed the claimant with a nasal bone fracture, severe headaches, and post-concussive syndrome. She ordered the claimant off work until March 5, 2012.[2] Dr. Prusek referred the claimant to Dr. Jolanta Milet, a chiropractor, for physical therapy.

¶ 13    The claimant began treating with Dr. Milet on February 28, 2012. The claimant complained of severe headaches and pain and stiffness in her upper neck and back. She also reported experiencing pain in her right elbow, right shoulder, low back, and both hips. The claimant continued to receive therapy from Dr. Milet through May 9, 2012. On that date, Dr. Milet noted that the claimant's condition was improving. The claimant did not follow up with Dr. Milet thereafter.

¶ 14    On August 6, 2012, the claimant was evaluated by Dr. Howard Freedburg, an orthopedic specialist. Dr. Freedburg noted that the claimant had suffered a right shoulder injury three years earlier, which resolved after eight weeks of physical therapy. Dr. Freedburg suspected that the claimant had now suffered a rotator cuff tear. He ordered an MRI of the claimant's right

---

[2] On March 5, 2012, Dr. Prusek noted that the claimant's post-concussive syndrome was improved but continued her off work until March 19, 2012.

shoulder, which was performed on September 6, 2012. The MRI showed probable posterior labral tearing and interstitial tearing of the supraspinatus and infraspinatus tendons, as well as moderate acromioclavicular (AC) degenerative change. Dr. Freedburg diagnosed a right rotator cuff tear with AC joint degenerative joint disease. He administered an injection to the claimant's right shoulder. The claimant reported 50 to 60% improvement following the first injection. She told Dr. Freedburg that she did not have time for additional physical therapy because she was currently working two jobs. On December 27, 2012, the claimant returned to Dr. Freedburg and reported that her shoulder was still bothering her. Dr. Freedburg noted that additional therapy, injections, or even surgery might be warranted if her complaints continued. However, the claimant did not subsequently return to Dr. Freedburg or seek any further treatment for her right shoulder.

¶ 15    During the arbitration hearing, the claimant testified that she continued to work for the employer in the same position. She noticed some pain in her right shoulder at the end of the work day and either took Advil or iced it to relieve the pain. On cross-examination, the claimant admitted that she had sustained a work injury to her right shoulder three years before the incident in question.

¶ 16    Walter Glomp, a former groundskeeper for the employer who worked in that capacity for 34 years, testified on behalf of the employer. Mr. Glomp stated that he recalled the claimant's February 23, 2012, work accident. Glomp testified that, during the winter months, his job duties including removing all ice and snow from sidewalks and parking lots on the employer's premises. On the morning of February 23, 2012, Glomp arrived to work at 6 a.m. and checked all 35 entrance doors to the school for ice before the buses arrived with students. Glomp found no ice or snow at that time. He checked again at approximately 11:30 a.m., and there was still no ice. Glomp testified that the temperature that day was cool but above freezing, and it was

raining. He noted that the snow had melted. He estimated that the temperature may have been between 35 and 40 degrees Fahrenheit.

¶ 17    Glomp testified that, at approximately 1 p.m., he was directed to go the "Door 2" sidewalk. Door 2 was at the front of the school building. According to Glomp, in order to reach the parking lot after exiting Door 2, a person must first walk down a handicap ramp, cross the bus run (which is a two-lane road), walk along a 15-foot sidewalk, and then enter the parking lot. When he arrived at Door 2 after the claimant's accident, Glomp walked from Door 2 to the parking lot, checking the premises for ice and snow. He found no ice and no snow. Glomp also inspected the sidewalk for defects, seams, or splits in the concrete and found none. However, Glomp noted that it was raining and the sidewalk in front of Door 2 was damp and wet from the rain.

¶ 18    Ruben Angel Perez, another groundskeeper for the employer, also testified. Perez testified that, on February 23, 2012, he was working with Glomp at approximately 1 p.m. when he was directed to inspect Door 2. When he arrived, Perez noticed blood on the sidewalk between the bus run and Door 2. He inspected the sidewalk in front of Door 2 and did not see any ice or snow. The sidewalk was wet because it had rained that day. Perez inspected the area for ice, snow, puddles, or defects and found none. Perez testified that the weather was "misty" with drizzle at the time.[3]

---

[3] Approximately seven months after the claimant's accident, Glomp and Perez each prepared written statements describing the results of their contemporaneous inspections of the area where the claimant fell on February 23, 2012. Glomp wrote that he and Perez inspected the sidewalk near Door 2 for ice and for any other loose materials, and found none. He indicated that the sidewalk was clear from Door 2 to the parking lot. Perez wrote that he and Glomp had

¶ 19    Officer Matthew Nelson, a police officer for the city of Wood Dale, also testified on behalf of the employer.  At the time of the claimant's accident, Nelson was assigned to the employer as a school resource officer.  Nelson recalled the February 23, 2012, incident and testified that, although he did not witness the claimant's fall, he responded to the incident nearly 30 seconds after it happened.  Nelson helped the claimant get back into the building and out of the rain.  According to Nelson, the claimant told him that she had fallen but did not say that she slipped on ice or snow or that she tripped on a crack or defect in the pavement.  Nelson stated that the area in which the claimant fell (a long walkway leading from the door to the parking lot) was wet and the ground was moist because it was raining.  Nelson did not inspect the area where the claimant fell.

¶ 20    The arbitrator found that the claimant had sustained accidental injuries arising out of her employment on February 23, 2012.  Citing our appellate court's decision in *First Cash Financial Services v. Industrial Comm'n*, 367 Ill. App. 3d 102, 106 (2006), the arbitrator noted that employment related risks are those to which the general public is not exposed, such as "the risk of tripping on a defect at the employer's premises" or "falling on uneven or slippery ground at the work site."  The arbitrator found that, in the instant case, "[t]he [claimant] provided direct evidence in the form of her credible testimony, as buttressed by the video, that she slipped on the wet concrete walkway located on [the employer's] premises resulting in her fall."  The arbitrator noted that "[the employer] does not dispute that the accident occurred in a wet area" and that "[a]ll of the [the employer's] witnesses support [the claimant's] account that the area was wet."  In addition, the arbitrator found that the claimant was exposed to an increased risk because the wet concrete area where she slipped and fell was "[an employer]-controlled designated pathway

_____

walked from the student drop-off point to Door 2 and found no ice.

specifically for [the claimant] to reach her employee designated parking spot." The arbitrator further found that the claimant's current conditions of ill-being were causally related to her February 23, 2012, work accident. The arbitrator awarded the claimant TTD benefits, PPD benefits for 10% loss of the person as a whole, and medical expenses.

¶ 21 The employer appealed the arbitrator's decision to the Commission, which reversed the arbitrator's decision. The Commission began its analysis by rejecting the arbitrator's reliance on *First Cash Financial Services*. The Commission noted that, in *First Cash Financial Services*, our appellate court characterized employment-related risks as those risks "to which the general public is not exposed," such as the risk of tripping on a defect at the employer's premises, "falling on uneven or slippery ground *at the work site*," or performing some work-related task which contributes to the risk of falling. (Emphasis added.) *First Cash Financial Services*, 367 Ill. App. 3d at 106. The Commission found that the risk confronted by the claimant in this case "[did] not meet the *First Cash* definition of employment risk" because, at the time of her fall, the claimant "had left her office and the building," "[s]he alleged no defect in the cement's surface or accumulation of ice or snow, and she was performing no work-related task that contributed to her risk of falling."[4]

¶ 22 The Commission also rejected the arbitrator's finding that the claimant's accident arose out of her employment under neutral risk principles. The Commission found that claimant "slipped on water and fell forward onto the pavement." The Commission acknowledged that, if the risk of falling on wet cement were deemed a neutral risk, and if claimant were exposed to a "greater risk of falling on wet cement than the general public due to her employment with the

---

[4] The Commission noted that the result "might be different if [the claimant] had fallen on an uneven or slippery floor inside the school building."

employer," then "the neutral risk could be compensable under the Act." However, the Commission found that such was not the case here. The Commission noted that (1) "[a]t the time of her accident, [the claimant] was not carrying anything other than her own purse and umbrella," (2) "[s]he was not hurrying to complete an assigned task," (3) "[t]he walkway where [the claimant] fell was not defective," (4) "[t]here was no accumulation of ice or snow that caused her to fall," and (5) "the walkway was open to the public." Accordingly, the Commission found that the claimant "was not at an increased risk for injury over that faced by any member of the general public in traversing wet pavement." The Commission therefore found the claimant's injuries (which were caused by the neutral risk of walking on wet pavement) to be noncompensable.

¶ 23     In sum, the Commission found that the claimant's injuries "did not result from an employment-related risk or from a neutral risk to which [the claimant] was at increased exposure as a result of her employment with [the employer.]" The Commission stated that, given the evidence presented, the claimant's risk of injury in this case was "personal." The Commission found that the claimant failed to prove by a preponderance of the evidence that her February 23, 2012, fall arose out of and in the course of her employment, and it denied all benefits.

¶ 24     Commissioner DeVriendt dissented. Commissioner DeVriendt concluded that the arbitrator correctly found that the claimant's fall arose out of and in the course of her employment. He noted that the claimant gave a consistent history to her treaters that she slipped on wet asphalt and the employer's witnesses testified that it was raining at the time of the incident. Moreover, Commissioner DeVriendt found it significant that the claimant "had an employee designated parking space and had to walk past the area of the entranceway to get to and from the school building on a regular basis." Commissioner DeVriendt concluded that the claimant "was exposed to a greater risk than the general public because she regularly passes the

entranceway where she fell to access her vehicle in her designated parking spot." The Commissioner relied upon *Mores-Harvey v. Industrial Comm'n*, 345 Ill. App. 3d 1034, 1042 (2004), in which we noted that "[b]y restricting where claimant could park her vehicle, the employer exercised control over its employees' actions," causing the employee to face risks to a greater extent than the general public. In sum, Commissioner DeVriendt concluded that the claimant was placed "at a greater risk than that of the general public" because (1) her fall "was a result of wet pavement which was a hazardous condition" and (2) the claimant "had to use that hazardous parking lot to access her car which was placed in an employee assigned spot." Accordingly, Commissioner DeVriendt would have affirmed and adopted the arbitrator's decision.

¶ 25    The claimant sought judicial review of the Commission's decision in the circuit court of Du Page County, which confirmed the Commission's ruling. The circuit court found that the wet pavement upon which the claimant fell was not a "hazardous condition" on the employer's premises that would render her injuries compensable. The circuit court found (as did the Commission) that there was no defect in the sidewalk where the claimant fell and no ice, snow, or puddled rain that would constitute a hazardous condition. The court concluded that the cases relied upon by the claimant to establish a hazardous condition were distinguishable because those cases either involved indoor wet surfaces or natural accumulations of snow and ice (as opposed to merely wet pavement). The court noted that, unlike rain, snow and ice "can be made safer by plowing or laying down salt," whereas "[t]here is no such option for rain."

¶ 26    The circuit court found that the claimant was injured while walking to her car, which is an "activity of daily living." The court noted that there was no evidence that the claimant's injury was caused by a risk personal to her, such as an idiopathic fall, or by a risk "distinctly associated with her employment." The court concluded that the risk of injury that the claimant

confronted was a "neutral risk of everyday living faced by all members of the general public." Whether an injury caused by exposure to such a neutral risk is compensable depends upon whether the claimant was exposed to a risk greater than that to which the general public is exposed. The court found no such increased risk in this case. The court rejected the claimant's argument that she confronted an increased risk because she "regularly passes the entranceway where she fell to access her vehicle in her designated parking spot." The court agreed with the Commission's assessment that this argument is "akin to a positional risk theory, which has been expressly rejected in Illinois." Moreover, the circuit court found that the claimant was "exposed to the same risk the general public was exposed to when traversing across wet pavement" because (1) the claimant "fell outside the front door of the school, a place where the general public would be expected to traverse as well as employees"; (2) while the claimant may regularly walk across this pavement to reach her car, "there is nothing in the record to distinguish this part of the pavement from any other part of the pavement"; and (3) the employer did not require the claimant to have an umbrella and purse at the time of her fall.

¶ 27    This appeal followed.

¶ 28                               ANALYSIS

¶ 29    The claimant argues that the Commission's finding that she failed to prove that she sustained an accident arising out of her employment is against the manifest weight of the evidence.

¶ 30    "To obtain compensation under the Act, a claimant bears the burden of showing, by a preponderance of the evidence, that [s]he has suffered a disabling injury which arose out of and in the course of h[er] employment." *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). The phrase "in the course of employment" refers to the time, place, and circumstances of the injury. *Eagle Discount Supermarket v. Industrial Comm'n*, 82 Ill. 2d 331, 338 (1980). If

the injury occurs within the time period of employment, at a place where the employee can reasonably be expected to be in the performance of his duties and while he is performing those duties or doing something incidental thereto, the injury is deemed to have occurred in the course of employment. *Id.*; see also *Sisbro*, 207 Ill. 2d at 203 (ruling that an injury occurs "[i]n the course of employment" when it "occur[s] within the time and space boundaries of the employment"). In this case, the parties agree that the claimant's accidental injuries occurred in the course of her employment with the employer. The contested issue is whether her injuries "arose out of" her employment.

¶ 31    An injury "arises out of" employment when "the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Sisbro*, 207 Ill. 2d at 203. To determine whether a claimant's injury arose out of her employment, we must first determine the type of risk to which she was exposed. *Baldwin v. Illinois Workers' Compensation Comm'n,* 409 Ill. App. 3d 472, 478 (2011). There are three categories of risk to which an employee may be exposed: (1) risks that are distinctly associated with one's employment, (2) risks that are personal to the employee, such as idiopathic falls, and (3) neutral risks that have no particular employment or personal characteristics, such as those to which the general public is commonly exposed. *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 27. "Injuries resulting from a neutral risk generally do not arise out of the employment and are compensable under the Act only where the employee was exposed to the risk to a greater degree than the general public." *Id.*; see also *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 45 (1987) ("For an injury to have arisen out of the employment, the risk of injury must be a risk peculiar to the work or a risk to which the employee is exposed to a greater degree than the general public by reason of his employment."); *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 59

(1989) ("[I]f the injury results from a hazard to which the employee would have been equally exposed apart from the employment, or a risk personal to the employee, it is not compensable.").

¶ 32    Whether an injury arose out of and in the course of one's employment is generally a question of fact and the Commission's determination on this issue will not be disturbed unless it is against the manifest weight of the evidence. *Brais v. Illinois Workers' Compensation Comm'n*, 2014 IL App (3d) 120820WC, ¶ 19. "In resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence." *Johnson v. Industrial Comm'n*, 278 Ill. App. 3d 59, 63 (1996).

¶ 33    The claimant argues that a *de novo* standard applies since the material facts related to claimant's fall in this case are not in dispute. However, the material facts in this case are subject to more than a single inference.[5]    Under these circumstances, the Commission's determination will not be disturbed on review unless it is against the manifest weight of the evidence.

---

[5] For example, the claimant testified that her fall was caused by "[t]he water, [t]he rain." Shortly after the accident, she told the school nurse and Dr. Bohman, the emergency room physician, that she had "slipped" on a wet surface. However, on cross-examination, she admitted that, at the time of her fall, she was wearing open-back, clog-like shoes, which had no strap or support on the back of them. The video of the claimant's accident does not conclusively establish whether and to what extent the wet surface contributed to the claimant's fall. As the claimant's legs come into view, her left leg appears to buckle or slip, and she then appears to stumble and possibly also slip as she attempts to regain her footing before falling. Accordingly, there was evidence in the record supporting at least two reasonable inferences as to the cause of the claimant's fall.

*Mansfield v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120909WC, ¶ 28; see also *Baumgardner v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 274, 279 (2011) ("Even in cases where the facts are undisputed, this court must apply the manifest-weight standard if more than one reasonable inference might be drawn from the facts."). The claimant argues that our review should be *de novo* because the Commission found that the claimant's fall was caused entirely by the wet surface. However, because the Commission was not *required* to reach that finding based on the evidence (*i.e.*, because the evidence supported more than one reasonable inference regarding the cause of the claimant's fall), we should review the case under the manifest-weight standard. *Mansfield*, 2013 IL App (2d) 120909WC, ¶ 28; *Baumgardner*, 409 Ill. App. 3d at 279.

¶ 34    "For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent from the record on appeal." *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315 (2009); see also *Swartz v. Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086 (2005). The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d at 828, 833 (2002).

¶ 35    In this case the Commission found that the claimant slipped and fell on wet pavement located on the employer's premises. The claimant fell as she was walking from the school building where she worked to her car, which was parked in a designated parking space in a nearby parking lot controlled by the employer. It is undisputed that there were no defects on the paved surface where the claimant fell at the time of her fall (*e.g.*, there were no holes, depressions, uneven surfaces, loose gravel, or puddles of rainwater). It is also undisputed that the area was free of any ice or snow. The surface was merely wet from the rain. There is no evidence that the employer required the claimant to walk in the particular area where she fell or

otherwise controlled the route that she took to her car. Nor is there evidence that some aspect of the claimant's employment enhanced the risk in some way. For example, the claimant was not rushing to complete a work task at the time of her accident. Although she was carrying an umbrella and a purse at the time, the employer did not require her to carry those items. Accordingly, the risk that the claimant confronted at the time of her accident was the risk of walking on wet pavement in the rain on property owned and controlled by her employer. The question presented in this case is whether an injury caused by an exposure to that risk, standing alone, is compensable under the Act.

¶ 36    We agree with the Commission that the claimant's accident is not compensable. The dangers created by rainfall are dangers to which all members of the public are exposed on a regular basis. These dangers, unlike defects or particular hazardous conditions located at a particular worksite, are not risks distinctly associated with one's employment. Accordingly, the claimant's claim in this case should be analyzed under neutral risk principles; *i.e.*, recovery should be allowed only if the claimant can establish that she was exposed to the risks of injury from rainfall to a greater degree than the general public by virtue of her employment. The claimant presented no such evidence in this case. Although the employer provided the claimant a designated parking space, there is no evidence that the employer exercised any control over the particular route the claimant took to her car or required the claimant to traverse the particular handicap ramp on which she was injured. Nor is there any evidence suggesting that the claimant's employment duties somehow contributed to her fall or enhanced the risk of slipping on wet pavement. For example, the claimant was not carrying any work-related items or hurrying to complete a work-related task at the time she slipped and fell.

¶ 37    Even assuming *arguendo* that the claimant had to traverse the same path twice or more per day to get to her car, she still could not recover benefits because there is no evidence that the

wet pavement she encountered on that path was any different or more dangerous than any other wet pavement regularly encountered by members of the general public while walking in the rain. See *Caterpillar Tractor Co.*, 129 Ill. 2d at 62-63. In *Caterpillar*, our supreme court denied benefits to a claimant who twisted his ankle while stepping off of a curb as he was walking from his workplace toward the employee parking lot on his employer's premises. Although our supreme court acknowledged that the claimant "regularly crossed" the curb upon which he was injured "to reach his car," it denied benefits because "[c]urbs, and the risks inherent in traversing them, confront all members of the public" and there was "nothing in the record to distinguish [the curb upon which the claimant was injured] from any other curb." *Id.* Thus, the supreme court found that the claimant was no more likely to twist his ankle at his workplace than he would have been had he been engaged in any other business. *Id.*

¶ 38 The same analysis applies here. The wet pavement upon which the claimant fell was no different from any other wet pavement. There were no defects, holes, depressions, uneven surfaces, or puddles on the pavement's surface. The paved surface was merely wet from the rain. The surface was sloped because it was a handicap ramp. However, the claimant presented no evidence suggesting that the paved handicap ramp upon which she fell was somehow different from or more hazardous than any other wet handicap ramp that members of the general public traverse every day. She did not argue that the ramp upon which she fell was unusually slippery when exposed to rainfall. Thus, there was no evidence suggesting that the claimant was more likely to slip and fall on her employer's premises than she or any other member of the public would be likely to fall on any other paved, wet, and sloped surface. The Commission properly rejected the claimant's claim under a neutral risk analysis. *Id.*

¶ 39 The claimant argues that the risk she encountered was distinctly associated with her employment because the wet pavement that caused her fall was located on her employer's

premises. She contends that her injuries are therefore compensable as a matter of law and that, because her injuries were caused by an employment-related hazard (rather than a neutral risk), her claim should not be analyzed according to neutral risk principles.

¶ 40 We acknowledge that both our supreme court and our appellate court have repeatedly held that accidental injuries sustained on property that is either owned or controlled by an employer within a reasonable time before or after work are generally deemed to arise out of and in the course of employment when the claimant's injury was sustained as a result of the hazardous condition of the employer's premises. See, *e.g.*, *Archer Daniels Midland Co. v. Industrial Comm'n*, 91 Ill. 2d 210, 216 (1982) ("Where the claimant's injury was sustained as a result of the condition of the employer's premises, this court has consistently approved an award of compensation."); see also *Hiram Walker & Sons, Inc. v. Industrial Comm'n*, 41 Ill. 2d 429 (1968) (holding that claimant's fall in employer's ice-covered parking lot was compensable); *Carr v. Industrial Comm'n*, 26 Ill. 2d 347 (1962) (same); *De Hoyos v. Industrial Comm'n*, 26 Ill. 2d 110 (1962) (same); *Caterpillar Tractor Co.*, 129 Ill. 2d at 62 (suggesting that an injury is causally related to the employment if the injury occurs "as a direct result of a hazardous condition on the employer's premises"); *Mores-Harvey* , 345 Ill. App. 3d at 1040 (the presence of a "hazardous condition" on the employer's premises that causes a claimant's injury, including a hazardous condition located in a parking lot the employer provides for its employees, "supports the finding of a compensable claim"); *Suter v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 130049WC, ¶ 40 (where the claimant slipped on ice in a parking lot furnished by her employer shortly after she arrived at work, the claimant was entitled to benefits under the Act "as a matter of law"). The presence of a "hazardous condition" on the employer's premises renders the risk of injury a risk incidental to employment; accordingly, a claimant who is injured by such a hazardous condition may recover benefits without having to prove that she was exposed to the

risk of that hazard to a greater extent than are members of the general public. *Archer Daniels Midland*, 91 Ill. 2d at 216; *Mores-Harvey*, 345 Ill. App. 3d at 1040; *Suter*, 2013 IL App (4th) 130049WC, ¶ 40. In other words, such injuries are not analyzed under "neutral risk" principles; rather they are deemed to be risks "distinctly associated" with the employment.

¶ 41    However, we find the above-references cases to be distinguishable from this case for one principal reason. In this case, unlike in those cases, the claimant's injury was not caused by a "hazardous condition" on the employer's premises. As noted, the claimant's injury was apparently caused by a paved surface that was wet due to *rainfall*. Each of the "hazardous condition" cases cited above involves injuries caused by the natural accumulation of *snow and/or ice* in a parking lot or other outdoor space owned or controlled by the employer (see, *e.g.*, *Archer Daniels Midland Co.*, 91 Ill. 2d at 216; *Hiram Walker & Sons, Inc.*, 41 Ill. 2d 429; *Carr*, 26 Ill. 2d 347; *De Hoyos*, 26 Ill. 2d 110-11; *Mores-Harvey*, 345 Ill. App. 3d at 1040; *Suter*, 2013 IL App (4th) 130049WC, ¶ 40). Other cases have ruled that injuries may be deemed to arise out of the employment if they are caused by defects or slippery *indoor* surfaces at the worksite. See, *e.g.*, *First Cash Financial Services*, 367 Ill. App. 3d at 106. However, the claimant cites no published case that holds or suggests that an outdoor, paved surface wet from rainfall constitutes a "hazardous condition" absent ice, snow, or some other defect or hazard. Nor have we found any such case.

¶ 42    That is not surprising. The rule urged by the claimant would hold an employer liable whenever one of its employees is injured by exposure to the elements or some other natural occurrence that occurs on the employer's property, even where the claimant's employment does not heighten the risk in any way. That is not the law. Our supreme court has squarely rejected the positional risk doctrine. See *Brady v. Louis Ruffolo & Sons Construction Co.*, 143 Ill. 2d 542, 552-53 (1991). Moreover, injuries caused by exposure to the elements or by "acts of God"

such as lightning strikes and tornados are compensable only if the claimant is exposed to the risk of injury from such occurrences to a greater degree than the general public or if the employment somehow enhances or "accentuate[s] the natural hazard from the elements." *American Freight Forwarding Corp. v. Industrial Comm'n*, 31 Ill. 2d 293, 294 (1964); see also *Alzina Construction Co. v. Industrial Comm'n*, 309 Ill. 395, 401 (1923) (denying compensation for injuries caused by a lighting strike where claimant's work did not make it more likely that he would be struck by lightning, and ruling that while an employer "cannot ordinarily be held liable to pay compensation for injury caused by forces of nature which he cannot reasonably foresee and guard against, where the employee is no more subject to injury from such forces than others," "the employer is liable where the work or method of doing it exposes the employee to the forces of nature to a greater extent than he would be exposed if not so engaged or to a greater extent than others in the community are exposed"); *Decatur-Macon County Fair Ass'n v. Industrial Comm'n*, 69 Ill. 2d 262 (1977) (holding that the widow of a fairgrounds caretaker killed by tornado that struck the fairgrounds could not recover benefits without showing that the decedent's employment duties exposed him to some special or heightened danger from the elements). In other words, when analyzing the risks posed by exposure to the elements or "acts of God," we apply neutral risk principles. The employee's injuries in such cases are compensable only if the claimant shows that he was exposed to some increased risk by virtue of his employment.

¶ 43    As noted above, the claimant has made no such showing in this case. Accordingly, the Commission's finding that the claimant failed to prove that she sustained accidental injuries arising out of her employment was not against the manifest weight of the evidence.[6]

---

[6] The claimant notes that the Commission erred by characterizing the risk of injury

¶ 44                                    CONCLUSION

¶ 45    For the reasons set forth above, we affirm the judgment of the circuit court of Du Page County, which confirmed the Commission's decision.

¶ 46    Affirmed.

---

encountered by the claimant as a "personal" risk.  Although the Commission did make one passing statement to that effect, it also conducted a neutral risk analysis and found that the claimant's injuries "did not result from an employment-related risk or from a neutral risk to which [the claimant] was at increased exposure as a result of her employment with [the employer.]"  When the Commission's decision is read in its entirety, it appears that the Commission found that the risk involved was neutral rather than personal.  In any event, we may affirm the Commission's decision on any basis supported by the record regardless of the Commission's findings or its reasoning.  *General Motors Corp. v. Industrial Comm'n*, 179 Ill. App. 3d 683, 695 (1989).  Accordingly, we affirm the Commission's denial of benefits under a neutral risk analysis without concluding that the claimant's fall was the result of a personal risk.